USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8-4-17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

STEVEN HIRSCH,

                         Plaintiff,

           -v-

CBS BROADCASTING INC. and CBS INTERACTIVE
INC.,

                        Defendants.

------------------------------------------------------------------X

17 Civ. 1860 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

    Plaintiff Steven Hirsch, a photojournalist based in New York City, brings this action against CBS Broadcasting, Inc. and CBS Interactive, Inc. (together, "CBS") under the Copyright Act, 17 U.S.C. § 101 *et seq.* (the "Act"), for copyright infringement and for alteration of copyright management information. Hirsch alleges that CBS infringed his copyright by using a photograph Hirsch had taken, without first obtaining a license or his consent, in an episode of the CBS television program *48 Hours*. Hirsch also alleges that CBS intentionally cropped Hirsch's "gutter credit" out of the photograph, and that this act constitutes unlawful alteration of copyright management information.

    CBS now moves to dismiss Hirsch's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, CBS's motion is denied.

**I.    Background**

    **A.    Factual Background**[1]

---

[1] The facts summarized here are drawn primarily from Hirsch's Complaint, Dkt. 1 ("Complaint") and the attached exhibits. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)

On or about April 2, 2010, Hirsch, a professional photojournalist in the business of licensing his photographs to online, print, and television media for a fee and based in New York City, took a photograph of a man named Justin Massler walking outside a courthouse in Manhattan. Complaint ¶¶ 5, 8 & Ex. A (the "Photo"). Massler had gained some notoriety because he had been accused of stalking Ivanka Trump. *Id.* ¶ 8. Hirsch then licensed the Photo to the New York Post, *id.* ¶ 9, which included the Photo later that day in an online article entitled "Ivanka's stalker ordeal featured crazed talk, threats and bloody pix," *id.* & Ex. B (the "Article"). Hirsch's name was featured in a "gutter credit" on the Photo, meaning that his name appeared in small print beneath the caption so as to credit him as the photographer. *Id.* ¶ 9 & Ex. B. Hirsch owned the copyright to the Photo, which was registered with the United States Copyright Office. *Id.* ¶¶ 10–11.

Nearly seven years later, on February 25, 2017, CBS broadcast an episode of the television show *48 Hours* titled "Stalked" on television and made the episode available online on its website. *Id.* ¶¶ 12–15. One segment of the Episode focused on Massler's history of stalking

---

("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").

The Court also considered the video of the *48 Hours* episode containing the alleged infringement. Dkt. 15, Ex. 1 (the "Episode"). On a Rule 12(b)(6) motion, documents outside the complaint may be considered if they are integral to the pleading or subject to judicial notice. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156–57 (2d Cir. 2006). The Episode is integral to the Complaint, as it contains the alleged infringement.

The Court accepts all factual allegations in the Complaint as true, drawing all reasonable inferences in Hirsch's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). But, Hirsch's characterization of the Episode need not be credited. *See Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) ("In copyright infringement actions, the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings.") (internal citations omitted).

behavior and the widespread news coverage it had attracted. *See* Episode at 8:50–13:45. In that segment, a CBS correspondent states that Massler had "already made headlines once in 2010 for pursuing . . . Ivanka Trump," *id.* at 13:35–45, and that "it was a huge story in 2010 when Massler targeted Trump with a barrage of ominous emails and tweets," *id.* at 14:27–36. After that comment, the segment features Massler's attorney, who discusses Massler's characteristics as images of Massler flash on the screen. *Id.* at 14:51–15:07. Then, as the correspondent describes Massler's 2010 arrest, two images of Massler appear. The first is apparently of Massler speaking in a courtroom. *Id.* at 15:09–10. The second is a screenshot of the Article, including the headline and the Photo at issue here. *Id.* at 15:12–14. Additional images of Trump and Massler are then displayed. *Id.* at 15:15–30. At 15:32, a different headline from the New York Post is flashed, this time with no accompanying image. *Id.* at 15:32. At 15:45, another headline and photo appear, again of Massler in a courtroom. The segment ends with further on-camera discussion between the CBS correspondent and Massler's attorney. *Id.* at 15:45–16:02.

The screenshot of the Article used in the Episode contained the Photo as well as the New York Post headline. *Compare id.* at 15:12–14 *with* the Article. The screenshot was on screen for approximately two seconds. *Id.* at 15:12–14. It slowly rotated clockwise the entire time it was on screen, starting slightly skewed to the left and ending slightly skewed to the right. *Id.* Only roughly the top half of the Photo appears in the image; it appears to be a cropped screenshot of the Article headline from the online presentation of the Article. *Compare id. with* the Article. Because the bottom half or so of the Photo is cropped out, Hirsch's gutter credit was excised and was not shown in the Episode. *See* Episode at 15:12–14.

CBS did not have Hirsch's consent, or a license, to use the Photo. *Id.* ¶¶ 13, 15.

**B.      Procedural History**

Hirsch filed the Complaint on March 13, 2017. Dkt. 1. On May 5, 2017, CBS filed a motion to dismiss, Dkt. 13, along with a memorandum of law, Dkt. 14, and a declaration by counsel in support attaching a full copy of the Episode, Dkt. 15, Ex. 1. On May 26, 2017, Hirsch filed a brief in opposition. Dkt. 19. On June 2, 2017, CBS filed a reply, Dkt. 20, and a declaration by counsel in support, Dkt. 21. On June 14, 2017, the Court held an initial conference in this case.

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *[f]actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks

omitted) (emphasis in *Arista Records*). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

## III. Discussion

Hirsch brings two claims under the Act: for (1) copyright infringement under 17 U.S.C. §§ 106, 501, and (2) removal of copyright management information in violation of 17 U.S.C. § 1202. Complaint ¶¶ 16–32. As relief, Hirsch seeks (1) a judgment of infringement; (2) actual damages or statutory damages of up to $150,000 per copyrighted work as authorized by 17 U.S.C. § 504; (3) an accounting of CBS's unlawful profits; and (4) attorneys' fees. *Id* at 6–7 ("Prayer for Relief").

CBS moves to dismiss on the grounds that (1) its use of Hirsch's work was *de minimis* such that, as a matter of law, it cannot support a violation of the Act (2) its use was a fair use; and (3) Hirsch has failed to plausibly allege a claim for removal of copyright management information. For the following reasons, the Court denies CBS's motion.

### A. Copyright Infringement—*De Minimis*

CBS first argues that its use of the Photo was *de minimis* such that, as a matter of law, it cannot support a claim for copyright infringement.

"To prevail on a claim of copyright infringement, the plaintiff must demonstrate both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108–09 (2d Cir. 2001). To establish infringement of the copyright, "a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Peter F. Gaito*,

602 F.3d at 63 (quotation omitted); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) ("To satisfy the second element of an infringement claim—the 'unauthorized copying' element—a plaintiff must show both that his [or her] work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'" (quotation omitted)).

Substantial similarity exists between the defendant's work and the protected aspects of the plaintiff's work when the copying at issue "is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred." *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 71, 75 (2d Cir. 1997).

"The qualitative component concerns the copying of expression, rather than ideas, a distinction that often turns on the level of abstraction at which the works are compared." *Id.* It turns on whether "an ordinary observer, unless he [or she] set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Yurman Design*, 262 F.3d at 111 (quotations omitted). Courts applying this test—the "ordinary observer test"—ask whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995) (quotation omitted); *see also Ringgold*, 126 F.3d at 77 (applying "average lay observer" test when evaluating qualitative component).

The qualitative component of the substantial similarity inquiry is satisfied here. CBS does not argue otherwise. The image displayed in the Episode is an exact copy of the Photo, and even though a fair amount of the Photo is cropped out, the average lay observer would recognize it as a copy.

As to the quantitative component, it "generally concerns the amount of the copyrighted work that is copied, a consideration that is especially pertinent to exact copying." *Ringgold*, 126 F.3d at 75. The copying of a work does not constitute unlawful infringement when the copying is *de minimis*, that is, copying that "has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity[.]" *See id.* at 74–75.[2]

In cases involving visual works, determining whether the "quantitative threshold" of substantial similarity has been crossed, supporting liability for copyright infringement, depends on the "observability of the copyrighted work in the allegedly infringing work." *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998). Observability, in turn, depends on "the length of time the copied work is observable in the allegedly infringing work and such factors as focus, lighting, camera angles, and prominence." *Ringgold*, 126 F.3d at 75; *see also Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 632 (S.D.N.Y. 2008) (same). Because substantial similarity "typically presents an extremely close question of fact . . . questions of non-infringement have traditionally been reserved for the trier of fact." *Peter F. Gaito*, 602 F.3d at 63 (citing *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 911 (2d Cir. 1980) ("[T]he question of infringement is generally resolved by the fact-finder's prediction of the probable reaction of a hypothetical 'ordinary observer.'")).

Nonetheless, as the Second Circuit has "repeatedly recognized," in an appropriate case, a district court may resolve the issue of substantial similarity as a matter of law, "'either because

---

[2] The *de minimis* nature of an act of infringement can support dismissal on two other theories, neither germane here. A *de minimis* violation can occur when there is "a technical violation of a right so trivial that the law will not impose legal consequences"; this implicates violations so trivial that they are "rarely litigated." The *de minimis* nature of a violation also comes into play when a defendant claims fair use of a copyright and argues that the copyrighted "portion used was minimal and the use was so brief and indistinct as to tip the third fair use factor decisively against the plaintiff." *Ringgold*, 126 F.3d at 74–75.

the similarity between the two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'" *Peter F. Gaito*, 602 F.3d at 63 (quoting *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983)). When visual works are at issue and (as here) are attached to the pleadings or otherwise cognizable on a motion to dismiss, the Court must determine whether a reasonable jury could find substantial similarity based upon a comparison of the two works; on this point, "no discovery or fact-finding is typically necessary." *Id.*; *see also Gottlieb*, 590 F. Supp. 2d at 632; *Le Book Publ'g, Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 309–10 (S.D.N.Y. 2005). When no reasonable jury could find substantial similarity, the claim must be dismissed, because the copying claimed by the plaintiff would not "plausibly give rise to an entitlement to relief," *Iqbal*, 556 U.S. at 679.

Here, having conducted such an inquiry, the Court concludes that a reasonable jury could find substantial similarity between the Photo and CBS's alleged copying of it in the Episode; that the copying was not, as a matter of law, *de minimis*; and that CBS infringed Hirsch's copyright.

The Court's analysis of the "quantitative component" of substantial similarity turns on the observability of the Photo in the Episode. Two Second Circuit precedents provide guideposts for the Court's analysis. In *Ringgold*, the set of a television show was decorated with a poster of a copyrighted painting. The painting appeared in nine separate shots, never for less than 1.86 or more than 4.16 seconds, covering an aggregate duration of 26.75 seconds. *Ringgold*, 126 F.3d at 76–77. In the longest segment, which lasted more than four seconds, "nearly all of the poster" was visible and its details "plainly observable, even though not in exact focus." *Id.* The Second Circuit held that the four-second segment, "[reinforced] by the briefer segments in which smaller portions [of the poster were] visible . . . [was] not *de minimis* copying" as a matter of law. *Id.* at

8

77. In contrast, the Second Circuit held in *Sandoval* that the copying at issue was below the quantitative threshold for substantial similarity because the offending background photographs were "filmed at such distance and so out of focus that a typical program viewer would not discern any decorative effect that the work of art contributes to the set." *Sandoval*, 147 F.3d at 218. The photographs were "displayed in poor lighting and at great distance" and appeared "fleetingly and [were] obscured, severely out of focus, and virtually unidentifiable[.]" *Id*.

This case is decidedly closer to *Ringgold* than *Sandoval*, such that a finding of *de minimis* use as a matter of law is not warranted. The observability factors of focus, lighting, camera angles, and prominence all disfavor a finding of *de minimis* infringement. The Episode displays a substantial proportion of the Photo in clear focus, and the Photo occupies much, although not all, of the screen. To be sure, a finder of fact must also consider the length of time the copied work is observable in the allegedly infringing work—here, roughly two seconds. But the Court is not aware of any authority that such a brief period alone defeats, as a matter of law, a finding of substantial similarity.

The case law instead is against CBS on this point. First, the Second Circuit has held that "the quantitative analysis of two works must always occur in the shadow of their qualitative nature." *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 71 (2d Cir. 1999). The qualitative assessment here, as noted, disfavors dismissal. Second, *Ringgold* suggested that a "substantially full-screen" display of an image, even lasting less than three seconds, would not be *de minimis*, *Ringgold*, 126 F.3d at 77, and several courts in this district have held similarly prominent infringements lasting less than three seconds not to constitute *de minimis* copying. *See Dyer v. V.P. Records Retail Outlet, Inc.*, No. 05 Civ. 6583 (WHP), 2008 WL 2876494, at *4 (S.D.N.Y. July 24, 2008) (denying summary judgment on grounds of *de minimis* copying for

9

shots in which offending images "take up most of the screen" for "almost three seconds");

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 155 F. Supp. 2d 1, 46 (S.D.N.Y. 2001), *remanded on other grounds*, 277 F.3d 253 (2d Cir. 2002) (finding likelihood that prominent display of several copyrighted clips, which each lasted less than three seconds, was not *de minimis*). Finally, the cases on which CBS relies did not base their findings of *de minimis* copying solely on the length of time the infringing material was observable. *See, e.g.*, *Gottlieb*, 590 F. Supp. 2d at 632–33 (finding *de minimis* copying where infringing material "is always in the background," "never appears by itself or in a close-up," is either "out of focus or obscured," and only displayed for "a few seconds at a time").

Accordingly, a reasonable jury could find that CBS's use of the Photo met the test of substantial quantitative similarity and was not *de minimis* as a matter of law.

## B. Copyright Infringement—Fair Use

CBS next argues that CBS's use of the Photo, as a matter of law, falls within the fair use defense to copyright infringement, requiring dismissal.

### 1. Governing Standards

The Act provides that "the fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107. As the purpose of copyright is "[t]o promote the Progress of Science and useful Arts," U.S. Const., Art. I, § 8, cl. 8, the Act bars liability for copyright infringement when the reproduction or copying of a copyrighted work is undertaken "for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research," 17 U.S.C. § 107. The fair use defense thus "allows the public to draw upon copyrighted materials without the permission of the copyright holder in certain circumstances." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014).

The Act sets out four factors to consider in determining whether a defendant's use of a copyrighted work is a fair use. These are "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. These four factors are non-exclusive; and "[a]lthough defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set forth in § 107 weighs in their favor." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476–77 (2d Cir. 2004) (internal citation omitted). There are no bright line rules to determine whether a use was a fair use; instead the analysis is to be done on a case-by-case basis, and all the factors "are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577–78 (1994).

The first statutory factor, the purpose and character of the use, is "[t]he heart of the fair use inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (quotation omitted). The essence of this factor is whether the copier's use is "transformative," that is, "whether the new work merely 'supersedes the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message[.]" *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (quoting *Campbell*, 510 U.S. at 579). If the original "is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings—that is the very type of activity that the fair use doctrine intends to protect[.]" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quotation omitted). As such, copying is transformative if it "uses the copyrighted material itself for a purpose, or imbues it with a character, different from that for

11

which it was created." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 180 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2175 (2017). Also relevant to this inquiry is whether the use falls within the categories identified by Congress in § 107—criticism, comment, news reporting, teaching, scholarship, and research—as these present the "most appropriate" circumstances for a finding of fair use. *TCA*, 839 F.3d at 179. The statute also requires a court to consider whether the use is commercial, although "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579 (citation omitted); *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014) (assigning "little weight" to commercial factor and recognizing that nearly all news organizations are commercial enterprises).

The second factor, "the nature of the copyrighted work," turns on "(1) whether the work is expressive or creative, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Cariou*, 714 F.3d at 709–10 (quotation and alteration omitted). Courts in the Second and other Circuits have found that when the original photographic work was created for news-gathering purposes, this factor favors fair use. *See, e.g.*, *N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 620 (S.D.N.Y. 2015) ("Courts analyzing . . . photographic works created for news gathering or other non-artistic purposes have found this factor to weigh in favor of fair use."); *Katz v. Google Inc.*, 802 F.3d 1178, 1183 (11th Cir. 2015) (holding photo at issue was factual or informational because it was "merely a candid shot in a public setting"). This factor, however, is "rarely found to be determinative." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001).

As to the third factor, "the amount and substantiality of the portion used," "[i]n general, the more of a copyrighted work that is taken, the less likely the use is to be fair." *Swatch*, 756 F.3d at 89 (quotation omitted). Courts consider not just the bare proportion of the original work used, but also "whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Cariou*, 714 F.3d at 710 (quotation and alteration omitted).

Finally, the fourth factor considers the effect of the use upon the potential market for the original. The inquiry here is whether the secondary use "usurps the market of the original work." *Blanch*, 467 F.3d at 258 (quotation omitted). Infringers usurp the market for copyrighted works when the infringer's target audience and the infringing content are the same as the original. *Cariou*, 714 F.3d at 709. Courts must also consider the harm to derivative markets for a copyrighted work, such as a market for licensing revenues. *TCA*, 839 F.3d at 186. Whether the secondary use is transformative is important to the usurpation analysis, as "[t]he more transformative [the secondary use], the less likel[y] that [it] substitutes for the original." *Cariou*, 714 F.3d at 709.

"The determination of fair use is a mixed question of fact and law." *Swatch*, 756 F.3d at 81. The Second Circuit has noted that in the context of the Lanham Act resolution of a fair use defense for use of a trademark "often requires consideration of facts outside of the complaint and is thus inappropriate to resolve on a motion to dismiss." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). The same principle holds true in copyright cases, because determination of fair use of a copyright is a similarly "'open-ended and context-sensitive inquiry'" that is "fact-driven[.]" *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 442 (S.D.N.Y. 2011) (quoting *Blanch*, 467 F.3d at 251); *see also Campbell*, 510 U.S. at 577 ("the [fair use] statute, like the doctrine it recognizes, calls for case-by-case analysis"). The Second Circuit has recognized, however, that

13

there are circumstances when "the only two pieces of evidence needed to decide the question of fair use" are the original work and the allegedly infringing work; in these circumstances, resolution of the issue as a matter of law may be appropriate on a motion to dismiss. *Cariou*, 714 F.3d at 707–08 (quoting *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012)). Such cases, however, are uncommon. Even in *Brownmark*, which upheld the lower court's finding of a parody to be an obvious fair use, the Seventh Circuit chose construe the motion on appeal as one for summary judgment. 682 F.3d at 692. As a court in this district has noted, whatever the theoretical possibility of resolving fair use on a motion to dismiss, "there is a dearth of cases granting such a motion." *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 505 (S.D.N.Y. 2015).

### 2. Discussion

Applying these familiar principles, the Court holds that CBS's claim of fair use cannot be resolved on the motion to dismiss. Whether or not this defense ultimately proves meritorious, CBS's fair use of the Photo has not been "so clearly established by the complaint as to support dismissal," *TCA*, 839 F.3d at 178.

Central to this conclusion, whether CBS's copying of the Photo was a fair use cannot be resolved with assurance on a visual comparison of the works alone. In this respect, *Cariou* and *Brownmark* are distinguishable, because the circumstances there enabled such an early-stage comparison. In *Cariou*, a "well-known appropriation artist" had altered photographs, previously published by another artist, by painting over them. *Cariou*, 714 F.3d at 699–703. In *Brownmark*, the issue was whether the animated television show *South Park* had presented a legitimate parody (and thus a protected fair use) of a viral internet video. *Brownmark*, 682 F.3d at 689. In each case, therefore, the question of transformative use—the heart of the fair use

14

inquiry—turned on differences between the original work and the allegedly infringing work that were apparent on the face of the two works.

In contrast, here, the fair use inquiry does not turn on visual differences. Instead, CBS simply reproduced a substantial proportion of the Photo, inserting it into a broadcast episode of *48 Hours*. CBS's claim that appropriating the Photo for this purpose was fair use will therefore turns on an assessment of the context and content of the Episode. One issue will be whether CBS's use qualifies as "news reporting" or "commentary," and thus a favored use under the statute. While the Court could hazard an assessment of this factor based on the four corners of the Episode, discovery of the Episode's overall context and content will enable a more careful assessment of how and whether the Episode's use of the Photo "serv[ed] the public by providing access to important . . . information," *Swatch*, 756 F.3d at 86. Relatedly, CBS's claim that its use of the Photo was "transformative" is not self-evidently correct based on a visual inspection. CBS included the Photo in the Episode, making no changes in it except the apparently non-substantive change of cropping it. Its inclusion of the heart of the Photo in a discussion of events from some seven years ago, does not so obviously "imbue [the Photo] with a character . . . different from that for which it was created," *TCA*, 839 F.3d at 180, as to permit a finding, on the pleadings, of transformative character. Discovery is necessary to resolve that claim. Finally, further development of the record is warranted, to clarify what, if any, new insights and understandings were created by CBS's use of the Photo here. Newsworthiness of the subject matter is not enough. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 557 (1985) ("The promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report.'"). As to these and potentially other salient aspects of the

fact-intensive fair use inquiry, the pleadings and cognizable materials—limited to the Complaint, the Photo and the Episode—do not contain enough factual content to enable a solid assessment.

Because the Court cannot conclude as a matter of law that CBS's use of the Photo was a fair use or (as reviewed above) *de minimis*, the Court must deny CBS's motion to dismiss the claim for copyright infringement.

C. **Removal of Copyright Management Information**

CBS also moves to dismiss Hirsch's claim for removal of copyright management information ("CMI") under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202(b). The Court denies this motion.

Section 1202(b) provides, in relevant part, that "[n]o person shall, without the authority of the copyright owner or the law . . . intentionally remove or alter any copyright management information . . . knowing, [or] having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title." 17 U.S.C. § 1202(b). "To establish a violation under subsection 1202(b), a plaintiff must show '(1) the existence of CMI on the [infringed work]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally.'" *E.g.*, *Gattoni v. Tibi, LLC*, No. 16 Civ. 7527 (RWS), 2017 WL 2313882, at *4 (S.D.N.Y. May 25, 2017) (quoting *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 609 (S.D.N.Y. 2010) (collecting cases)). The parties do not dispute either that Hirsch's gutter credit qualifies as CMI, or that it was cropped out of the Photo as used in the Episode.

CBS argues that the Complaint fails to plead sufficient facts to give rise to a plausible inference of knowing removal and intent to facilitate infringement. The Complaint's allegations of CBS's knowing removal are indeed sparse. Hirsch alleges only that on "information and

16

belief," CBS "intentionally and knowingly removed copyright information identifying Plaintiff as the photographer of the Photograph," Complaint ¶ 27, and that "[u]pon information and belief, the . . . removal of said [CMI] was made by Defendants intentionally, knowingly, and with the intent to induce, enable, facilitate, or conceal their infringement of Plaintiff's copyright in the Photograph," *id*. ¶ 30.

Nonetheless, these allegations are sufficient to state a claim for removal of CMI. Courts must be "lenient in allowing scienter issues . . . to survive motions to dismiss." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (quotation omitted); *accord Fischer v. Forrest*, No. 14 Civ. 1304 (PAE), 2015 WL 195822, at *9 (S.D.N.Y. Jan. 13, 2015). Here, the conduct pled supplies a fair basis on which to infer this element. Review of the Episode clearly reveals a cropping out of Hirsch's gutter credit from the Photo. The amount of material cropped out was minimal, and within it, Hirsch's photo credit was prominent. It is therefore fairly inferred, at the pleading stage, that the CBS employee(s) who excised Hirsch's photo credit did so aware that a photo credit was being eliminated and that the photo as cropped would therefore appear on a televised episode. The facts adduced in discovery, of course, may place CBS's elimination of Hirsch's photo credit in a more benign light; they may, for example, reveal the cropping to have been inadvertent. But, making all reasonable inferences in Hirsch's favor, as the Court must, the Complaint's allegations that the removal was intentional and knowing and undertaken in support of CBS's infringement of the Photo give rise to a plausible inference of intentional removal of CMI. *See BanxCorp.*, 723 F. Supp. 2d at 610 ("Providing an actual example of the allegedly infringing ad is obviously more than a conclusory allegation."); *Devocean Jewelry LLC v. Associated Newspapers Ltd.*, No. 16 Civ. 2150 (KMW), 2016 WL 6135662, at *2 (S.D.N.Y. Oct. 19, 2016) ("Plaintiff has done enough by alleging that Defendant

17

removed the CMI from the Screen Grabs and by attaching as an exhibit to the Complaint a copy of the article in which the altered screen grabs appeared.").

The Court therefore denies CBS's motion to dismiss Hirsch's claim for removal of CMI.

## CONCLUSION

For the foregoing reasons, the Court denies CBS's motion to dismiss. The Court directs the parties to confer and to submit, by August 18, 2017, a civil case management plan and scheduling order in accordance with the Court's Individual Rules.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 13.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: August 4, 2017
       New York, New York